UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NANCY JASER,<br><br>                              Plaintiff,<br><br>    -against-<br><br>KADMON HOLDINGS, INC., HARLAN W. WAKSAL, TASOS G. KONIDARIS, EUGENE BAUER, DAVID E. COHEN, ARTHUR KIRSCH, NANCY MILLER-RICH, and CYNTHIA SCHWALM,<br><br>                              Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Nancy Jaser ("Plaintiff"), by the undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Kadmon Holdings, Inc. ("Kadmon" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Kadmon, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed merger (the "Proposed Transaction") of Kadmon and Sanofi, a *societe anonyme* formed under the laws of France ("Sanofi") and Latour Merger Sub, Inc., a Delaware corporation

1

and wholly owned indirect subsidiary of Sanofi ("Merger Sub").

2.       On or about September 8, 2021, Kadmon and Sanofi announced that they had entered into an agreement and plan of merger, pursuant to which, Merger Sub will merge with and into the Kadmon, with the Kadmon surviving as a wholly owned indirect subsidiary of Sanofi. (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, Kadmon's shareholders would be entitled to receive $9.50 per share in cash for each share of Kadmon common stock they owned (the "Merger Consideration").

3.       On or about September 21, 2021, in order to convince Kadmon's public common stockholders to vote in favor of the merger, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4.       In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction, the interest of company insiders, and the valuation analyses performed by Kadmon's financial advisors, Cantor Fitzgerald, L.P. ("Cantor Fitzgerald") and Moelis & Company LLC ("Moelis" and together with Cantor Fitzgerald, the "Financial Advisors") regarding the Proposed Transaction.

5.       The Proposed Transaction is expected to close during the fourth quarter of 2021 and the special meeting of the Company's shareholders to vote on the Proposed Transaction is forthcoming.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

6.       For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Kadmon's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

<u>**JURISDICTION AND VENUE**</u>

7.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Kadmon's securities trade on the Nasdaq Global Market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District appropriate.

*See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Kadmon common stock.

11.     Defendant Kadmon is a Delaware corporation with its headquarters located at 450 East 29th Street, New York, NY 10016.  The Company's common stock trades on the Nasdaq under the ticker symbol "KDMN."

12.     Defendant Harlan W. Waksal, M.D. ("Waksal") is, and has been at all relevant times, the Company's President, Chief Executive Officer and a director of the Company.

13.     Defendant Tasos G. Konidaris ("Konidaris") is, and has been at all relevant times, the Chairman of the Board of Directors of the Company.

14.     Defendant Eugene Bauer, M.D. ("Bauer"), and has been at all relevant times, a director of the Company.

15.     Defendant David E. Cohen, M.D., MPH ("Cohen") is, and has been at all relevant times, a director of the Company.

16.     Defendant Arthur Kirsch ("Kirsch") is, and has been at all relevant times, a director of the Company.

17.     Defendant Nancy Miller-Rich ("Miller-Rich") is, and has been at all relevant times, a director of the Company.

18.     Defendant Cynthia Schwalm ("Schwalm") is, and has been at all relevant times, a director of the Company.

19.     The Defendants identified in paragraphs 12 through 18 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the

"Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.   Background of the Company and the Proposed Transaction

20.    Kadmon is a publicly traded Delaware corporation and biopharmaceutical company that discovers, develops and delivers transformative therapies for unmet medical needs. RezurockTM (belumosudil), an oral, once-daily tablet, is approved in the United States for the treatment of adult and pediatric patients 12 years and older with chronic graft-versus-host disease (cGVHD) after failure of at least two prior lines of systemic therapy. The Company's clinical pipeline includes treatments for immune and fibrotic diseases as well as immuno-oncology therapies.  Headquartered in New York, New York, Kadmon's common stock trades on the Nasdaq under the ticker symbol "KDMN."

21.    Prior to the announcement of the Proposed Transaction, Kadmon had excellent growth prospects.

22.    For example, on August 5, 2021 just a few weeks before the Proposed Transaction was announced, Kadmon issued a press release entitled *Kadmon Provides Business Update and Reports Second Quarter 2021 Financial Results* that announced that the Company was poised for continued and sustained growth, stating in part:

> NEW YORK, NY / ACCESSWIRE / August 5, 2021 / Kadmon Holdings, Inc. (NASDAQ:KDMN) today provided a business update and reported financial and operational results for the second quarter of 2021. "The recent U.S. FDA approval of REZUROCK marked a transformative event for Kadmon and for patients living with cGVHD. REZUROCK represents a paradigm shift in the cGVHD treatment landscape by uniquely addressing both the immune and fibrotic components of the disease," said Harlan W. Waksal, M.D., President and CEO of Kadmon. "We look forward to bringing this meaningful new therapy to patients in the U.S. by the end of this month." Dr. Waksal added, "Our momentum continues as we advance our portfolio of product candidates.

Initial data from our open-label, Phase 2 trial of belumosudil for the treatment of systemic sclerosis is anticipated by year-end 2021. The recent positive initial safety data presented at ASCO on KD033, our anti-PD-L1/IL-15 fusion protein, supports our confidence in the therapeutic potential of IL-15 for cancer. We look forward to sharing additional clinical data from this trial in the fourth quarter of 2021."

23.    Thus, the Proposed Transaction comes at a time when Kadmon's future success was not fully reflected by its share price.  As a result, the Proposed Transaction will "compensate" the Company's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

24.    Despite Kadmon's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out the Company's stockholders and deprives them the ability to partake in the Company's growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration and allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

## II.    The Proposed Transaction

25.    On September 8, 2021, Kadmon issued a press release announcing the Merger Agreement:

### Sanofi To Acquire Kadmon to Further Strengthen Growth of Transplant Business

September 8, 2021

*Adds Rezurock™ (belumosudil) an FDA-approved, first-in-class treatment for adult and pediatric patients 12 years and older with chronic graft-versus-host disease (cGVHD) after failure of at least two prior lines of systemic therapy*

**PARIS, FRANCE and NEW YORK, NY / ACCESSWIRE / September 8, 2021** / Sanofi has entered into a definitive merger agreement with Kadmon Holdings, Inc. (NASDAQ:KDMN) a biopharmaceutical company that discovers, develops,

and markets transformative therapies for disease areas of significant unmet medical needs. The acquisition supports Sanofi's strategy to continue to grow its General Medicines core assets and will immediately add Rezurock™ (belumosudil) to its transplant portfolio. Rezurock is a recently FDA-approved, first-in-class treatment for chronic graft-versus-host disease (cGVHD) for adult and pediatric patients 12 years and older who have failed at least two prior lines of systemic therapy.

Shareholders of Kadmon common stock will receive $9.50 per share in cash, which represents a total equity value of approximately $1.9 billion (on a fully diluted basis). The Sanofi and Kadmon Boards of Directors unanimously approved the transaction.

*"We are transforming and simplifying our General Medicines business and have shifted our focus on differentiated core assets in key markets,"* said Olivier Charmeil, Executive Vice President General Medicines. *"We are thrilled to add Kadmon's Rezurock to our well-established transplant portfolio. Our existing scale, expertise, and relationships in transplant create an ideal platform to achieve the full potential of Rezurock, which will address the significant unmet medical needs of patients with chronic graft-versus-host disease around the world."*

*"We are excited that Sanofi has acknowledged the value of Rezurock and the deep potential of our pipeline,"* said Harlan Waksal, M.D., President and Chief Executive Officer, Kadmon. *"By leveraging Sanofi's global resources and long-standing expertise in developing and commercializing innovative medicines, Rezurock is now well positioned for global accessibility, faster. I want to thank the entire Kadmon team, including management and the Board of Directors, and the Sanofi organization, for their ongoing commitment to patients and their caregivers."*

Sanofi's transplant business mainly consists of Thymoglobulin® (anti-thymocyte globulin), a polyclonal, anti-human thymocyte antibody preparation that acts as a broad immunosuppressive and immunomodulating agent and Mozobil® (plerixafor), a hematopoietic stem cell mobilizer. Both products are among General Medicines core assets and are currently registered and marketed in more than 65 countries.

In July 2021, the FDA approved Rezurock for the treatment of adult and pediatric patients 12 years and older with cGVHD after the failure of at least two prior lines of systemic therapy. Rezurock was launched in August in the United States. It is the first and only approved small molecule therapy that inhibits the Rho-associated coiled-coil kinase 2 (ROCK2), a signaling pathway that modulates inflammatory response and fibrotic processes. Sanofi will work closely with regulatory authorities across different geographies to ensure that patients suffering from cGVHD can benefit from belumosudil treatment as early as possible. Kadmon is also developing Rezurock for the treatment of diffuse cutaneous systemic sclerosis, with an open-label Phase 2 clinical trial currently ongoing.

Kadmon's pipeline includes drug candidates for immune and fibrotic diseases as well as immuno-oncology therapies. The transaction is expected to be modestly dilutive to Sanofi's EPS in 2022.

**Transaction Terms**

Under the terms of the merger agreement, holders of Kadmon's common stock will receive $9.50 per share in an all-cash transaction, reflecting a total equity value of Kadmon of approximately $1.9 billion. The offer price represents a premium of 79% over the closing price on September 7, 2021 and a premium of approximately 113% over the 60 trading days volume weighted average price.

The consummation of the transaction is subject to customary closing conditions, including the approval of holders of a majority of the outstanding shares of Kadmon voting stock, the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and other customary conditions. Following the successful completion of the merger, a wholly owned subsidiary of Sanofi will merge with Kadmon and the outstanding Kadmon shares will receive $9.50 per share in cash. Sanofi plans to fund the transaction with available cash resources. Subject to the satisfaction or waiver of customary closing conditions, Sanofi expects to complete the acquisition in the fourth quarter of 2021.

Weil, Gotshal & Manges LLP is acting as legal counsel to Sanofi. Cantor Fitzgerald & Co. and Moelis & Company LLC are acting as exclusive financial advisors to Kadmon in the transaction, while DLA Piper LLP (US) is acting as legal counsel.

## III.   The Preclusive Deal Protection Devices

26.   To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

27.   The Merger Agreement is protected by "no-shop" provisions that prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

28.   These no-shop provisions also require the Board to provide Sanofi written notice of any Acquisition Proposal and further requires the Board to provide prior written notice of its

intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Sanofi following receipt of the notice, so that Sanofi has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

29.     In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of $60.125 million with respect to any termination under the no-shop provision.

30.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

31.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

## IV.     Insiders' Interests in the Proposed Transaction

32.     Kadmon insiders are the main beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured exclusive benefits for themselves from the Proposed Transaction.

33.     All unvested company options, including those held by Kadmon non-employee directors and executive officers, will fully vest, and each company option that is outstanding will

be canceled and converted into the right to receive an amount in cash.

34.     All unvested Company SARs which are outstanding will fully vest, and each Company SAR will be canceled, with the former holder of such canceled Company SAR becoming entitled to receive an amount in cash.

35.     All unvested Company EARs which are outstanding, including those held by Kadmon executive officers, will fully vest and each Company EAR will be canceled, with the former holder of such canceled Company EAR becoming entitled to receive an amount in cash.

36.     The following table sets forth the number of shares of Common Stock, Preferred Stock, Company Options, Company SARs and Company EARs that are currently held by each of the Company's executive officers, non-employee directors, and the amounts that would be realized (subject to any required tax withholdings or deductions) by such individuals with respect to these shares based on the Common Stock Merger Consideration assuming that the closing of the Merger occurred on September 17, 2021:

| Name | Shares (#)[1] | Shares ($) | Options (#)[2] | Options ($) | Company SARs (#)[3] | Company SARs ($) | Company EARs (#) [4] | Company EARS ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Harlan W. Waksal, M.D. | 177,945 | $1,690,478 | 6,732,652 | $23,647,300 | 655,000 | $3,838,300 | 750 | $1,337,713 | $30,513,791 |
| Eugene Bauer, M.D. | 6,716 | $ 63,802 | 347,395 | $ 2,028,507 | — | $ — | — | $ — | $ 2,092,309 |
| David E. Cohen, M.D. | — | $ — | 346,944 | $ 2,194,844 | — | $ — | — | $ — | $ 2,194,844 |
| Arthur Kirsch | 30,000 | $ 285,000 | 346,112 | $ 2,187,547 | — | $ — | — | $ — | $ 2,472,547 |
| Tasos Konidaris | — | $ — | 418,410 | $ 2,502,733 | — | $ — | — | $ — | $ 2,502,733 |
| Nancy Miller-Rich | — | $ — | 133,339 | $ 767,912 | — | $ — | — | $ — | $ 767,912 |
| Cynthia Schwalm | 31,000 | $ 294,500 | 346,944 | $ 2,194,844 | — | $ — | — | $ — | $ 2,489,344 |
| Steven Meehan | 24,909 | $ 236,636 | 1,970,000 | $11,451,050 | — | $ — | — | $ — | $11,687,686 |
| Gregory S. Moss | 17,671 | $ 167,875 | 1,660,566 | $ 9,602,050 | — | $ — | 200 | $ 356,724 | $10,126,648 |
| John Ryan | — | $ — | 598,078 | $ 3,200,000 | — | $ — | 250 | $ 445,904 | $ 3,645,904 |

37.     Remarkably, Kadmon entered into employment agreements ("Employment Agreements") with each of Harlan W. Waksal, M.D., Steven Meehan, and Gregory S. Moss, its executive officers. On September 7, 2021, in connection with the approval of the Merger Agreement and the transactions contemplated thereby, the Board approved certain amendments to

the Employment Agreements.

38.     The Employment Agreements, as amended, provide for the payment of retention bonuses in the amount of $3,500,000 to Dr. Waksal, $1,000,000 to Mr. Meehan and $1,000,000 to Mr. Moss (the "Retention Bonuses"). The Retention Bonuses were paid 25% on the date the Merger Agreement was fully executed and the remaining 75% will be earned on the Closing Date, subject to the executive's continuous and active employment with the Company through such date unless his employment is terminated without cause or he resigns with good reason (as such terms are defined in the Employment Agreements, as amended) prior to such date.

39.     The Employment Agreements, as amended, also provide for severance payments to Dr. Waksal and Messrs. Meehan and Moss in the event the executive's employment is terminated without cause, or he resigns with good reason, in either case during the three months prior to, as of, or within 12 months following the effective date of a change in control.

**V.      The Proxy Omits Material Information**

40.     On or about September 21, 2021, in order to convince the Company's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

41.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

**A.      The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

42.     The Proxy fails to provide material information regarding the background of the merger that implicates the possibility that the Merger Consideration is inadequate.

43.     The Proxy fails to disclose that at the last shareholder meeting on May 12, 2021 – while the Board was in the midst negotiating the Proposed Transaction – the Board narrowly obtained shareholder approval for an amendment to the 2016 Equity Incentive Plan to remove a limit on the number of units the Company could award to their non-employee directors.

44.     The Proxy also fails to disclose what the potential timeframe for receiving an indication of value from Party B was, which is especially material because the Company did not begin its outreach to other potential counterparties "between August 10 and August 11," and by August 23, they essentially dismissed any potential parties who did not have diligence completed.

**B.      The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

45.     The Proxy also omits material information that renders the Financial Advisors' Fairness Analysis materially misleading.

46.     The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

47.     With respect to Cantor Fitzgerald's *Selected Companies Analysis* beginning on Page 36, the Proxy fails to disclose (i) the objective criteria that Cantor Fitzgerald relied upon in

choosing the ten selected companies and omitting other publicly traded late-stage rare disease biopharmaceutical companies, (ii) the enterprise values for each of the selected companies, and (iii) Cantor Fitzgerald's full rationale and basis for selecting a range of 2026E revenue multiples of 1.00x to 3.00x, including the full rationale and basis for using 2026E Revenue as the key valuation metric and the source of 2026E Revenue projections for each of the selected companies, which indicate different multiples when compared with the analysis by Moelis.

48.     With respect to Cantor Fitzgerald's *Selected Precedent Transactions Analysis* beginning on Page 36, the Proxy fails to disclose: (i) the objective criteria that Cantor Fitzgerald relied upon in choosing the ten selected companies and omitting other publicly traded late-stage rare disease biopharmaceutical companies, (ii) whether the transaction involved cash consideration, stock consideration, or a cash-stock mix, (iii) Cantor Fitzgerald's full rationale and basis for selecting a range of enterprise values of $1,250 million to $2,000 million, and (iv) Cantor Fitzgerald's full rationale and basis for selecting a range of 2026E revenue multiples of 2.25x to 4.25x.

49.     With respect to Cantor Fitzgerald's *Discounted Cash Flow Analysis* ("DCF") beginning on Page 37, the Proxy fails to: (i) fully disclose Cantor Fitzgerald's rationale and basis for selecting a discount rate range of 9.5% to 11.5%, including the size premium that was applied, (ii) disclose the full rationale and basis for assuming free cash flows would decline in perpetuity at a rate ranging from 60% to 10% year-over-year, (iii) disclose the full rationale and basis underlying the selection of a $200 million enterprise value for the Company's oncology platform, including the source of the enterprise valuations for the selected comparable companies, which indicate different enterprise valuations from the analysis conducted by Moelis, and (iv) provide a sensitivity table that summarizes the implied valuations across the full range of discount and

13

growth rates.

50.     With respect to Moelis' *Discounted Cash Flow Analysis* ("DCF") beginning on Page 41, the Proxy fails to: (i) fully disclose Moelis' rationale and basis for selecting a discount rate range of 8.25% to 10.75%, including the size premium that was applied, (ii) disclose the full rationale and basis for assuming free cash flows would decline in perpetuity at a rate ranging from 75% to 25% year-over-year, and (iii) provide a sensitivity table that summarizes the implied valuations across the full range of discount and growth rates.

51.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow*

*Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges properly value the Company or were the result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed Transaction.

52.     With respect to Moelis' *Selected Publicly Traded Companies Analysis* beginning on Page 42, the Proxy fails to disclose (i) the objective criteria employed in choosing the selected companies, and (ii) the full rationale and basis for selecting a range of 2026E revenue multiples of 1.50x to 2.25x for the KD025 asset, including the full rationale and basis for using 2026E Revenue as the key valuation metric and the source of 2026E Revenue projections for each of the selected companies, which indicate different multiples when compared with the analysis by Cantor Fitzgerald, and (iii) the full rationale and basis underlying the selection of a $175 million to $350 million enterprise value for the Company's IO Platform assets, including the source of the enterprise valuations for the selected comparable companies, which indicate different enterprise valuations from the analysis conducted by Cantor Fitzgerald,

53.     With respect to Moelis' *Selected Precedent Transactions Analysis* beginning on Page 44, the Proxy fails to disclose: (i) the objective criteria and rationale and basis employed in choosing the selected transactions, (ii) whether the transaction involved cash consideration, stock consideration, or a cash-stock mix, (iii) the full rationale and basis for selecting a range of TEV / CY-5 Sales multiples of 1.50x to 3.00x, and (iv) the full rationale and basis for selecting a range for the Company's Total Enterprise Value of $1.5 billion to $2.5 billion.

54.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the

Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

55.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

57.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

58.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

59.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants

reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

60.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

61.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were

required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

62.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

63.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

64.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

66.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

67.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

69.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their

input on the content of those descriptions.

70.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

71.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

72.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.


Dated: October 1, 2021

**OF COUNSEL:**

**ADEMI LLP**
Guri Ademi
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com

*Attorneys for Plaintiff*

**MONTEVERDE & ASSOCIATES PC**

  */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*